IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

In re:

| | |
|---|---|
| Harvey B. and Joan S. Haukaas, | Case No. 10-14251 |
| Debtors. | (Chapter 7) |
| Harlan C. and Anita K. Haukaas, | Case No. 10-14242 |
| Debtors. | (Chapter 7) |

---

| | |
|---|---|
| LeRoy Lee, | |
| Plaintiff, | |
| v. | Adv. No. 10-245 |
| Harvey B. Haukaas | |
| Defendant, | **Consolidated for Trial** |
| LeRoy Lee, | |
| Plaintiff, | |
| v. | Adv. No. 10-246 |
| Harlan C. Haukaas, | |
| Defendant. | |

---

MEMORANDUM DECISION

On the eve of trial for this nondischargeability action the parties submitted a jumbled

statement of agreed facts and asked the court to decide the issues on those facts without further

hearing.  The burden of proof on all issues lies with the plaintiff and the plaintiff's counsel was

so admonished, but still requested a decision without further hearing.  This memorandum

decision is therefore based on the agreed facts submitted and the inferences drawn therefrom.

The following are the facts relevant to this decision.  The defendants, Harlan Haukaas

and his father Harvey Haukaas were shareholders in the closely held Chequamegon Bay Title

and Abstract, Inc. ("Chequamegon"). The defendants also controlled two other entities, Walking

Drum, LLC ("Walking Drum") and Haukaas Properties, LLC.  In April, 2001, Walking Drum

gave a construction mortgage to M&I Marshall & Ilsley Bank ("Bank"), securing a loan to

Walking Drum of roughly $1.3 million.

The plaintiff, LeRoy Lee owned and operated North Wisconsin Abstract Co. ("Abstract")

in Ashland, Wisconsin for thirty years.  Abstract and Chequamegon were competitors in the

abstract business.  On June 5, 2002, Lee agreed to sell all of Abstract's assets and goodwill to

Chequamegon for $300,000 ("Abstract sale").  The $300,000 was to be paid by a $25,000

immediate payment and $10,000 payments on December 31 of each following year.  The sale

also provided that Lee would work for Chequamegon at a salary of $60,000 per year until July

31, 2005.

In July, 2003, Walking Drum defaulted on the construction loan.  In exchange for a

forbearance agreement, Walking Drum and Chequamegon, executed and delivered a Cross

Collateral/Cross Default Agreement to the Bank.

On September 7, 2004, the Bank obtained a foreclosure judgment for $1.22 million

against Walking Drum, LLC, Haukaas Properties, LLC and Chequamegon (referred to

collectively as the "judgment debtors") in Ashland County Circuit Court.  The Bank was also

awarded replevin of:

> [A]ll equipment, furniture, inventory, documents, general intangibles, accounts, deposit
> accounts (unless a security interest would render a nontaxable account taxable) contract

2

rights, chattel paper, instruments, letter of credit rights and investment property, now owned or hereafter acquired by Debtor (or by Debtor with spouse) and all additions and accessions to, all spare and repair parts, special tools, equipment and replacements for, software used in, all returned or repossessed goods the sale of which gave rise to and all proceeds, supporting obligations, and products of the foregoing ("Collateral"), wherever located, to secure all debts, previously granted, credit contemporaneously granted and credit granted in the future by Lender to any Debtor, to any Debtor and another, or to another guaranteed or indorsed by any Debtor ("Obligations").[1]

The replevin judgment was held in abeyance pursuant to a stipulation[2] regarding the commercially reasonable sale of the collateral owned by Chequamegon.  The collateral described in the judgment appears to be all personal (and real) property of Walking Drum, Haukaas Properties, LLC and Chequamegon.

The Bank sold certain property in partial satisfaction of its replevin judgment, and entered into a stipulated judgment ("stipulated judgment") with the judgment debtors for the remaining amount.  In relevant part, the stipulated judgment provided that:  the defendants were liable for $467,368.35 jointly and severally; and Chequamegon was to hold an asset sale before May 15, 2005 from which $300,000 was to be paid to the Bank.[3]  Although the asset sale was scheduled, it did not occur before May 15, 2005.  In the summer of 2005, the Bank commenced collection efforts against the defendants personally.  In July, 2005, the defendants incorporated Northwest Title, Inc. ("Northwest").

By August, 2005, Chequamegon was insolvent and no longer a going concern.  It had unsecured debt of roughly $563,000, including the debt owed to Lee.  The defendants sought to retain ownership over Chequamegon, yet were unable to find financing.  The parties seem to

---

[1] I presume that this was the same collateral listed in the Cross Collateral Agreement dated July, 2003 that was delivered to the Bank by Walking Drum and Chequamegon.  The text of that agreement was not offered into evidence.
[2] The stipulation dated April 18, 2005, is the only one provided by the parties and may be the one referred to in the foreclosure and replevin judgment. [It is attached as Exhibit 1.]
[3] There is no indication that the Bank, at any time, released Chequamegon from its security interest.

agree that Chequamegon had valuable assets (worth as much as $350,000), but do not explain how any of those assets might be unencumbered by the Bank's security interest and judgment.

On August 8, 2005, the defendants executed an agreement ("New Corp. Agreement") with Chequamegon's landlord, Henry Martinsen.  Martinsen agreed to transfer $200,000 to Northwest in exchange for all shares of Northwest's stock.  The defendants loaned Northwest $150,000 ("2005 loan"), which they borrowed against their personal residences.  The total funds, $350,000, were then transferred to the Bank and the Bank released the defendants from personal liability on the judgment.  The Bank did not release any of the other judgment debtors from liability.  It assigned its deficiency on the judgment, and all rights to it, to Northwest. [4] Northwest then transferred the deficiency judgment to Chequamegon in exchange for all assets and "liabilities, except any liability for amounts owed to LeRoy Lee…".

Chequamegon did not enforce the deficiency judgment against any individual or entity. On August 18, 2005, Chequamegon reported to the state court that the judgment was "satisfied." Chequamegon was dissolved on December 1, 2005.   Northwest continued to do business under the name of Chequamegon Bay Title and Abstract, Inc. until 2009.  Presently, Northwest is no longer operating.

From August, 2005 until January, 2009, Northwest made sporadic payments to Lee on the obligation owed from the Abstract sale, totaling $101,000.   Northwest also made payments to various banks on behalf of the defendants for their 2005 loan to Northwest.    In January, 2009, Northwest was insolvent.  When Lee learned that Chequamegon no longer existed, he was still owed $261,555 on the Abstract sale debt.

---

[4] The actual Assignment of Judgment and Consent dated August 8, 2005, was referred to in the New Corp. Agreement, but was not put into evidence.   According to the New Corp. Agreement, the Bank assigned "its Judgment and Documents" to Northwest, which presumably included the rights afforded under the Bank's replevin judgment.

Lee now argues that his claim of $261,555 is nondischargeable under § 523(a)(4) and § 523(a)(6). His claim is based on the transfer of Chequamegon's assets to Northwest in 2005, and the events relating to that transfer.

Lee was at all times an unsecured creditor of Chequamegon and did not have an interest in any specific property of Chequamegon. Nor did he have any direct personal claim against the defendants. At the time Chequamegon's assets were transferred, the Bank had a replevin judgment against all of Chequamegon's assets. That replevin recognized that on July 25, 2003, the defendants gave a security interest in all of Chequamegon's "equipment, fixtures, inventory, documents, etc." to the Bank. The security interest included all property that had been purchased from Abstract under the sale agreement in 2002. In April of 2005, the stipulated judgment required that an asset sale be scheduled from which $300,000 would be turned over to the Bank in satisfaction of its lien against Chequamegon. However, the sale never occurred and accordingly, the Bank's lien was not satisfied. With Chequamegon's assets having a stipulated value of $350,000 and the Bank's judgment in excess of that amount, there was no equity (or excess value in the assets) that could be applied to the payment of unsecured claims. In light of this security interest, and given the financial condition of Chequamegon in April, 2005, Lee would have had to look to future income of Chequamegon for payment of his unsecured claim. In fact, he was paid $101,000 from Chequamegon's future income after the 2005 asset transfer occurred. Chequamegon's assets were consumed by the Bank's judgment, and unavailable for levy. The most Lee can claim is that the assets of Chequamegon were sold for so much less than their actual value that an excess above the Bank's lien was made unavailable to Chequamegon's unsecured creditors. But the parties have agreed to no facts that would support such a conclusion.

5

In August 2005, the Bank released the defendants from all personal liability on the judgment. The Bank did not release Chequamegon, or the other judgment debtors. Upon receipt of the $350,000 from Northwest, the Bank assigned its interest in the replevin judgment to Northwest. So, Northwest held all rights in the replevin judgment against Chequamegon, including an interest in all of Chequamegon's assets, at the time of the transfer that Lee claims to have been fraudulent. Any interest of the other creditors in Chequamegon's assets would have been subordinate to that of Northwest. Accordingly, Lee suffered no injury by the transfer of the Chequamegon's assets to Northwest.

Lee also argues that the conduct of the defendants and Martinsen constituted civil conspiracy. In Wisconsin, civil conspiracy is established where:

> Any 2 or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of willfully or maliciously injuring another in his or her reputation, trade, business or profession by any means whatever…shall be punished by imprisonment in the county jail not more than one year or by fine not exceeding $500. WIS.STAT. § 134.01.

To establish civil conspiracy, the plaintiff must prove that the defendants "acted together; with a common purpose to injure his business; with malice; and the acts financially injured him." *See Zwiacher v. Community Health Network, Inc.*, 2009 WL 606112 (Wis. Ct. App. 2009). For conduct to be "malicious," it must be "conduct intended to cause harm for harm's sake." *Maleki v. Fine-Lando Clinic Chartered, S.C.*, 469 N.W.2d 629 (Wis. 1991).

In this case, it is apparent that Martinsen and the defendants worked in concert to complete the series of transactions set forth under the New Corp. Agreement. However, their intention was not to directly harm Lee, but rather to save the operations of Chequamegon from termination by the Bank's foreclosure. This is inferred by the fact that both Martinsen and the defendants put up new money to save Chequamegon's operations. The only evidence of

6

negative intent from which an inference can be drawn is the New Corp. Agreement that explicitly excluded the debt owed to Lee from being assumed by Northwest.   The exception of Lee's debt is at best ambiguous.  Subsequent conduct suggests that the exception was intended to facilitate continued payments to Lee by Northwest (operating under the name Chequamegon) under the Abstract sale agreement.  That other unsecured creditors received different (and better) treatment does not suggest a conspiracy when prior contract terms are substantially observed.

Lastly, Lee argues that the defendants breached their fiduciary duties owed to creditors, by transferring corporate assets to secure satisfaction of their personal debt.  In Wisconsin, "when the corporation becomes insolvent, the fiduciary duty of the directors shifts from the stockholders to the creditors." *Polsky v. Virnich*, 779 N.W.2d 712, 716 (Wis. Ct. App. 2010) (citing *FDIC v. Sea Pines Co.*, 692 F.2d 973, 976-77 (4th Cir. 1982)).  Thus at the time of insolvency, "the officers...no longer represent the stockholders, but by the fact of insolvency, become trustees for the creditors," and they cannot transfer its property or pay cash, prefer themselves or other creditors.  *Id.* at 716-17.  This duty is breached, where a president of a corporation assigns corporate property of the insolvent corporation to secure a preexisting debt that the president had personally guaranteed.  *Malloy v. Korf*, 352 F.Supp 569, 571 (E.D. Wis. 1972).  When such breach occurs, the creditor is entitled to restitution. *Id.*

However, the actual transfer of all value in Chequamegon's assets was by the Cross Collateral Agreement delivered to the Bank, in 2003, and there is no evidence that the corporation was insolvent at that time.  The only other asset transfer occurred in 2005, when Chequamegon transferred its assets to Northwest in satisfaction of the deficiency judgment and Lee was not injured by that transfer.  Chequamegon was insolvent at the time of that transfer, but its assets were all subject to the replevin judgment.  They had no value for unsecured creditors.

Accordingly, the defendants only caused Chequamegon's assets to be delivered to a secured creditor, who had a right to them that was superior to Lee's interest (if any). There is insufficient evidence to establish that the defendants, while operating Northwest, breached their fiduciary duty to Lee.

Although there is evidence the defendants received corporate distributions from Northwest after 2005 and before 2009, there is little evidence that Northwest was insolvent during that period. Without evidence of insolvency, corporate directors do not share a fiduciary relationship with creditors. *See Polsky*, 779 N.W.2d at 714 (citing *Beloit Liquidating Trust v. Grade*, 270 Wis. 2d. 356 (Wis. 2004)). For this reason, the defendants did not breach any fiduciary duties by receiving corporate distributions.

I cannot find that the defendants' conduct caused any damage to Lee, nor that he was injured by the 2005 transfer of Chequamegon's assets. Having proved no injury, Lee cannot prevail on a claim for nondischargeability under § 523(a)(6). In addition, even if Lee was injured by the defendants' conduct, the evidence is insufficient to support a finding of nondischargeability under § 523(a)(4).

Section 523(a)(4) provides that: "A discharge under section 727…of this title does not discharge an individual debtor from any debt—for fraud or defalcation while acting in a fiduciary capacity…". 11 U.S.C. § 523(a)(4). To establish a claim under § 523(a)(4), a plaintiff must establish that: (1) a fiduciary relationship existed between the parties; and (2) the defendant committed "fraud or defalcation …while acting as a fiduciary of the trust." S*ee* 11 U.S.C. § 523(a)(4); *see also In re Frain*, 230 F.3d 1014, 1019 (7th Cir. 2000). The fiduciary relationship generally must arise in the context of "express trust." *See Davis v. Aetna Acceptance Co.,* 293

U.S. 328, 333 (1934) (the words "fiduciary capacity" should be interpreted in a "strict and narrow" manner). The Seventh Circuit however, has held that a fiduciary relationship can be created through either an express trust, or in rare circumstances, through an implied fiduciary status. *See In re Marchiando*, 13 F.3d 1111, 1113-14 (7th Cir. 1994). Courts will infer the existence of an express trust where characteristics such as the "segregation of funds, management by financial intermediaries, and recognition that the entity in control of the assets has at most 'bare' legal title" are present. *In re McGee*, 353 F.3d 537, 540 (7th Cir. 2003). These qualities demonstrate a clear intent to create an express trust as opposed to a mere contractual relationship. *See In re Berman*, 629 F.3d 761, 769 (7th Cir. 2011). Lee bears the burden to prove all elements by a preponderance of the evidence. *See In re Martin*, 698 F.2d 883, 887 (7th Cir. 1983).

When a corporation becomes insolvent, Wisconsin law creates a fiduciary relationship between corporate directors and creditors. *Polsky*, 779 N.W.2d at 716. While corporate directors owe fiduciary duties, this type of fiduciary relationship does not fall within § 523(a)(4). *See In re Berman*, 629 F.3d at 769 (holding the fiduciary relationship that corporate officers share with creditors during insolvency does not imply a fiduciary relationship within the scope of § 523(a)(4)). To decide otherwise, "would go a long way toward imposing nondischargeable personal liability on corporate officers and directors for general corporate debts of faltering corporations." *Id.* at 766.

There is no evidence that the defendants and Lee intended to create an express trust when the parties executed the Abstract sale in 2002. There was no requirement that the defendants segregated any funds for the benefit of Lee, or that a separate fiduciary account had been established. The two parties simply had an agreement for the repayment of the sale price, which

created an unsecured debt.  Lee cannot satisfy the first element required by § 523(a)(4), and

therefore has not established a claim for nondischargeability.

The defendants' conduct did not injure Lee, nor has Lee met his burden under

§ 523(a)(4).  Lee's complaint is DISMISSED, and his claim is discharged under § 727(a).  It may

be so ordered.

Dated: July 27, 2011

ROBERT D. MARTIN
UNITED STATES BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

In re:

Harvey B. and Joan S. Haukaas,                                                 Case No. 10-14251

                                Debtors.                                       (Chapter 7)

Harlan C. and Anita K. Haukaas,                                                Case No. 10-14242

                                Debtors.                                       (Chapter 7)

LeRoy Lee,

                                Plaintiff,
v.                                                                             Adv. No. 10-245

Harvey B. Haukaas

                                Defendant,                          **Consolidated for Trial**

LeRoy Lee,

                                Plaintiff,
v.                                                                             Adv. No. 10-246

Harlan C. Haukaas,

                                Defendant.

ORDER

The Court having reached the conclusions of law in the memorandum decision filed this

date, it is hereby ORDERED that the Plaintiff's complaint is DISMISSED, and the debt owed to

LeRoy Lee is discharged.

Dated:  July 27, 2011

ROBERT D. MARTIN
UNITED STATES BANKRUPTCY JUDGE